UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIE EARL MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:15 CV 294 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Willie Earl Moore for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff was born on December, 30 1948. (Tr. 53.) He filed his application for supplemental security income benefits on November 27, 2012. He alleged an onset date of November 3, 2012 at 63 years of age. (Id.) He alleged that he was unable to work due to Chronic Obstructive Pulmonary Disease (COPD). (Id.) The claim was denied on March 11, 2013. (Tr. 14.) Thereafter, plaintiff filed a written request for a hearing before an Administrative Law Judge on March 15, 2013. (Id.)

The ALJ held a video hearing on February 27, 2014, and on April 17, 2014 determined that plaintiff was not disabled. (Tr. 11, 14.) The Appeals Council denied the

plaintiff's request for review on January 5, 2015. (Tr. 1.) The decision of the ALJ therefore is the final decision of the Commissioner. 20 C.F.R. § 404.984(d).

## II. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Step Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant

work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

### III. MEDICAL AND OTHER ADMINISTRATIVE RECORD

On November 3, 2012, plaintiff visited St. Mary's Health Center emergency department for shortness of breath (SOB). (Tr. 172.) SOB was a recurrent problem for plaintiff. Also noted were cough, sputum production, and chest pain (chest tightness). (Tr. 173.) Plaintiff had no fever, sore throat, neck pain, vomiting, abdominal pain, rash, or anxiety. (Id.) Plaintiff had prior hospitalizations for emphysema. (Id.) Plaintiff's physical exam showed he was alert and oriented to person, place, and time. (Tr. 174.) He was given a dose of xopenex via EMS prior to arrival and at the hospital he was given continuous duoneb and IV solumedrol. (Tr. 176.) His condition improved and he felt well enough for discharge. (Id.) Plaintiff's final diagnosis was SOB and COPD.[1] (Id.) Lab tests showed that his lungs were clear. (Tr. 179.) Plaintiff was prescribed albuterol as needed for SOB or wheezing. (Tr. 188.) Plaintiff was discharged on the same day. (Tr. 172.)

On November 13, 2012, plaintiff visited St. Mary's Health Center emergency department for SOB. (Tr. 192.) His symptoms began 45 minutes prior to arrival and he took albuterol with no relief. (Id.) Plaintiff denied chest pain, cough, fever, and chills prior to this episode. (Id.) He was placed on BiPap by EMS for moderate respiratory distress. (Id.) Plaintiff reported significant improvement with albuterol treatment and he

---

[1] Chronic obstructive pulmonary disease (COPD) is a condition in which airflow from the lungs is restricted. The lungs cannot return to normal; however, there are measures that can be taken to improve their condition. Primary causes of COPD are smoking, exposure to secondhand smoke, breathing in irritants, and a history of lung infections. Treatment includes prescription medications (inhalers or pills) to improve a person's breathing. (Tr. 189.)

3

was offered admission, but declined. (Tr. 195.) A chest x-ray showed clear lungs. (Tr. 201.) Plaintiff was discharged that same day with instructions on medications and follow-up care. (Tr. 192, 197.)

On February 17, 2013, plaintiff visited St. Mary's Health Center emergency department for SOB. (Tr. 234.) Plaintiff was noted to have a history of asthma, COPD, hepatitis B and C (received treatment for hepatitis C at Barnes Jewish Hospital in Saint Louis), and SOB. (Tr. 235.) Plaintiff was in mild respiratory distress when he arrived at the emergency room and was on a non-rebreather. (Id.) He was given nebulizers, steroids, and some IV fluids. (Id.) He complained of chest tightness and felt nauseated for which he was given aspirin. (Id.) Plaintiff felt better with breathing treatment and steroids for his COPD exacerbation. (Id.) His stress test was negative. (Id.) Plaintiff claimed he had a scrotal lesion but the ultrasound did not show any mass therefore an outpatient surgical evaluation was needed. (Id.) Plaintiff was asked if he used IV drugs to which he responded "No," and he was unsure how he contracted hepatitis B and C. (Tr. 239.) Plaintiff admitted that he smokes marijuana occasionally. (Id.) A chest x-ray showed normal heart size and clear lungs. (Tr. 259.) Plaintiff was discharged on February 20, 2013, with diagnoses of (1) acute COPD with exacerbation, (2) chest pain, (3) scrotal lesion, (4) unspecified viral Hepatitis C, and (5) hyperglycemia. (Tr. 234-35.)

Almost monthly from March 28, 2013 through January 9, 2014, plaintiff visited the Myrtle Hilliard Davis Comprehensive Health Center. The reports of these visits are largely normal, including notations about normal essential hypertension, headaches, and eye discharge. (Tr. 277-310.)

On August 9, 2013, plaintiff visited Saint Louis ConnectCare for management of bronchitis. (Tr. 313.) Plaintiff was referred for breathing problems. (Id.) He said he received breathing treatment and was also diagnosed with hypertension and diabetes. (Id.) His medications included Lisinopril and ProAir inhaler. (Id.) Plaintiff was advised to control his weight, exercise daily, avoid tobacco and inhaled irritants, and avoid driving or operating machinery. (Tr. 315.) An x-ray of plaintiff's chest conducted on the same day showed clear lungs and normal heart size. (Tr. 312.)

4

On October 11, 2013, plaintiff visited Jean Johnson-Strachan, M.D., for a follow-up. (Tr. 291.) Plaintiff complained of intermittent headaches. (Id.) He denied worsening of headaches or change in frequency. (Id.) They last for a few seconds and resolve spontaneously. (Id.) Plaintiff denied dizziness. (Id.) He requested Claritin pills after reporting seasonal allergies such as watery-itchy eyes. (Id.)

On November 19, 2013, plaintiff visited Leslie McCrary-Etuk, M.D., for a follow-up. (Tr. 286.) Plaintiff informed the doctor that he used his albuterol inhaler daily and experienced nighttime symptoms more than twice a week. (Id.) Plaintiff had had no emergency room visits since February. (Id.) His medications included Claritin, Lisinopril, Mucinex, Pravastatin Sodium, and ProAir inhaler. (Id.) Plaintiff claimed occasional alcohol and marijuana use. (Tr. 287.) The doctor added Advair for COPD and instructed plaintiff to inhale one puff twice a day even if there are no symptoms of SOB or wheezing. (Tr. 288-89.)

On November 20, 2013, plaintiff visited the Pulmonary Clinic at Barnes Jewish Hospital for evaluation of COPD. (Tr. 272.) Plaintiff coughs on daily basis but with no mucus or fluids ejected from his lungs and he has dyspnea[2] with mild activities but no chest pain or palpitations. (Id.) Plaintiff quit cigarette smoking 20 years ago but he has a history of cocaine use. (Id.) He also has secondary smoke exposure from family. (Id.) Plaintiff was scheduled for a three month follow-up on February 21, 2014. (Tr. 271.) Plaintiff's assessment showed he was at GOLD[3] Stage II COPD.[4] (Tr. 273.) Plaintiff

---

[2] Shortness of breath is medically known as dyspnea. Mayo Clinic Staff, *Shortness of Breath*, MayoClinic.org, http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890.

[3] GOLD stands for Global Initiative for Chronic Obstructive Lung Disease. It was created to increase awareness of COPD among health professionals, public health authorities, and the general public. In addition, GOLD seeks to improve prevention and management of COPD. About Us, GOLD, http://www.goldcopd.org/about-us.html.

[4] Stage II is Moderate COPD. It is worsening airflow limitation with shortness of breath typically developing with exertion. It is also the stage at which patients usually seek medical attention due to the exacerbation of the disease. (Forced Expired Volume in one second ($FEV_1$)/Forced Vital Capacity (FVC) < 70%; 50% ≤ $FEV_1$ < 80% predicted).

does not have difficulty walking, getting dressed, bathing/grooming, memory problems, eating/feeding problems, speaking problems, and does not have difficulty performing daily activities including cooking, cleaning, shopping, and driving. (Tr. 274.)

Plaintiff's x-ray of his chest on November 20, 2013, was compared to the last examination on May 15, 2013, which revealed no change in the pattern of moderate COPD or in minimal elongation of the aortic arch. (Tr. 306.)

On December 19, 2013, plaintiff visited Dr. McCrary-Etuk for a follow-up visit regarding COPD. (Tr. 282.) Plaintiff had no complaints and said he had been using albuterol inhaler daily. (Id.) Plaintiff had no recent emergency room visits. (Id.) His COPD was stable. (Tr. 284.) Plaintiff was recommended he continue taking Lisinopril for hypertension. (Id.)

On December 31, 2013, plaintiff visited Laila Gabrawy, M.D., for a routine ophthalmology appointment. (Tr. 278.) Plaintiff complained of blurry vision, itchy and dry eyes. (Id.) Plaintiff's eye assessment showed that he had borderline glaucoma ocular hypertension in both eyes. (Tr. 280.) Plaintiff was prescribed reading glasses to improve central distance vision, near vision, reduce the risk of vision loss, stabilize the vision, and alleviate eye pain. (Id.)

On February 21, 2014, plaintiff visited the Pulmonary Clinic at Barnes-Jewish Hospital for a follow-up and complained of pain in his left leg and right arm. (Tr. 320.) He denied SOB and no respiratory distress was noted or voiced. (Id.) He uses Advair twice daily and albuterol one to two times daily. (Tr. 321.) Plaintiff was diagnosed with glaucoma since his last visit to this clinic and takes eye drops. (Id.) He also takes tramadol for osteoarthritis of his knee and hip. (Id.) Plaintiff was noted to be in no distress, and his cardiac and pulmonary examinations were normal. (Tr. 322.)

---

GOLD, Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease 12-18 (2015), available at
 http://www.goldcopd.org/uploads/users/files/GOLD_Pocket_2015_Feb18.pdf.

## IV. ALJ HEARING

The ALJ held a video hearing on February 27, 2014. (Tr. 25.) Plaintiff attended with his counsel and testified to the following facts. (Id.) He was at the time 65 years old and weighed 185 pounds. (Tr. 29, 30.) He is divorced. (Tr. 29.) He lives with his sister and her two kids aged seven or eight and fourteen (Id.) His sister works as a home healthcare aide and takes care of a patient who lives with them. (Tr. 30.) The patient has been living with them for a few years. (Id.) Plaintiff helps take care of the patient sometimes by cooking and doing his laundry. (Id.) Plaintiff does not have a state ID card. (Tr. 31.) His driver's license expired in the early nineties and he did not renew it because he was in and out of jail. (Id.) He has been incarcerated "three or four" times. (Id.) The last time he was in prison was in 2009 for possession of cocaine (Id.) He was in prison for nineteen months before being released after serving his time (Tr. 32.)

Plaintiff rode the bus to the hearing site, which took about forty minutes. (Id.) He did not have any problems physically or mentally making the trip. (Id.) Plaintiff lives in the basement in his sister's house. (Tr. 33). He has to go down one flight of stairs to get to his bedroom. (Id.) He has trouble walking up and down the stairs, and sometimes he has to use an inhaler. (Id.) He has trouble in his left leg, but he does not know its diagnosis. (Tr. 34.) He received a referral to Saint Louis University Hospital, but because they do not accept Medicaid, he has to be sent back to Barnes-Jewish Hospital to determine why his left leg is troubling him. (Id.) Plaintiff's sister has been supporting him financially to a degree since he filed this application in November of 2012. She has patients whom she cares for outside the home so plaintiff will babysit her seven-year-old when he gets out of school. (Id.) He also takes care of the patient living at home when his sister is taking care of other clients. (Id.) Plaintiff receives $189 in food stamps. (Tr. 34, 35.) Plaintiff has been eligible for Medicaid since December 2013. (Tr. 35.) Plaintiff's education extended through the tenth grade; he received his GED. (Id.)

From 1976 to 1989 plaintiff worked at different restaurants. (Tr. 36.) ALJ noted there were no wages posted to plaintiff's earnings record from 1966 to 1989. (Id.) Plaintiff claims he had jobs and did not work for cash, rather on salary. (Id.) He has not

7

worked since November 2012 and has not looked for work since then either. (Tr. 37.) The Missouri Department of Vocational Rehabilitation (DVR) placed plaintiff in the MERS program through Goodwill. (Id.) He worked at Goodwill part-time for about a year in 2000. (Id.) He has not worked with DVR since then because he "[c]aught up on drugs." (Id.) Plaintiff has used PCP, marijuana, and cocaine. (Tr. 38.) He used marijuana a couple months prior to the hearing date, smoking it once or twice a month. (Id.) He stopped smoking cigarettes in the late nineties. (Id.) He inhaled cocaine six months prior to the hearing date. (Id.)

Plaintiff has COPD and Glaucoma. (Tr. 38, 48.) Plaintiff is prescribed medications for blood pressure and allergies, painkillers for his arms and legs, medication for his eyes, medication to control cholesterol level, and two inhalers (Pro-Air and Advair Discus). (Tr. 40.) Plaintiff admitted that, when he uses the prescribed inhalers and does not smoke substances or cigarettes, his breathing is controlled. (Id.) Plaintiff can walk three to four blocks without getting tired. (Id.) His legs limit him from standing for long periods. (Tr. 40, 41.) He can lift thirty pounds. (Tr. 41.) Plaintiff admitted to being able to get out of bed in the morning, bathe and dress, use the toilet, prepare his meals, walk in the neighborhood, and do his laundry. (Tr. 41, 42.) He also takes out the trash and does yardwork for his sister such as picking up leaves or transferring bushes. (Tr. 43.)

The ALJ assumed limitations of medium work, avoid working in the presence of concentrated exposure to dust, odors, perfumes, pulmonary irritants, extreme cold, extreme heat, and unsuitable working with the general public due to speech impediment. (Tr. 50.) The vocational expert (VE), McGrowsky, Ph.D., testified that based on his residual functional capacity (RFC), plaintiff can work as a laundry worker, transporter of patients in a hospital, or as a day worker. (Tr. 50, 51.) The ALJ referred plaintiff for a post-hearing consultative examination (CE) and pulmonary function study. (Tr. 51, 317.)

## V. DECISION OF THE ALJ

On April 17, 2014, the ALJ found plaintiff not disabled. (Tr. 11.) At the First Step the ALJ found that plaintiff had not been engaged in substantial activity since November 27, 2012, the application date. (Tr. 16).

At Step Two the ALJ found plaintiff had severe impairments: polysubstance abuse including cannabis and cocaine (both inhaled), chronic obstructive pulmonary disease (COPD), osteoarthritis of knees and hips, and speech impairment characterized by intermittent stuttering. (Id.)

At Step Three the ALJ found plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), § 416.925 and § 416.926). (Tr. 17.) The ALJ considered plaintiff's impairments individually and in combination but found that the combined clinical findings from these impairments did not reach the Listings level of severity. (Id.)

At Step Four the ALJ considered the entire record and determined plaintiff had the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. § 416.967(c), except that plaintiff could not work near concentrated exposure to dust, odors, fumes, pulmonary irritants, and extreme heat or cold. (Tr. 18) In addition, plaintiff should never work with the public. (Id.) The ALJ found plaintiff had no past relevant work (PRW). (Tr. 20).

At Step Five the ALJ, with the testimony of a VE, found there was work in significant numbers in the national economy that plaintiff could perform. (Tr. 21.) Subsequently, the ALJ found that plaintiff was not disabled as defined in the Social Security Act from November 27, 2012 through the date of his decision. (Id.)

## VI. DISCUSSION

Plaintiff argues that the ALJ failed to properly consider his residual functional capacity and failed to properly consider his credibility. (Doc. 18, at 3, 5.)

## A. Plaintiff's Credibility

Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence, because the ALJ failed to explain how plaintiff's daily activities supported exertional requirements of medium work and the ALJ did not properly consider the type, dosage, and side effects of prescription medications. (Doc. 18 at 7, 8.)

In evaluating a plaintiff's subjective symptoms, using the Polaski factors the ALJ must make a credibility determination. Polaski v. Heckler, 739 F.2d 1322 (8th Cir. 1984). See Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). These factors include: (1) the plaintiff's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. Polaski, 739 F.2d at 1322. The ALJ does not need to discuss each factor separately; rather, the court will review the record as a whole to ensure such evidence was not disregarded by the ALJ. See McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011); see also Dunahoo, 241 F.3d at 1039 ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth). Subjective complaints may be discounted if there are inconsistencies in the record as a whole. Polaski, 739 F.2d at 1322; see also Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (The ALJ discounted plaintiff's credibility when the evidence showed that plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart."). The ALJ must make an express credibility determination for rejecting plaintiff's complaints of pain by giving reasons for discrediting the testimony, setting the inconsistencies, and discussing the Polaski factors. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (impairments which may be controlled with

treatment, including certain respiratory problems, do not support a finding of disability, and failure to follow a prescribed treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits).

Substantial evidence supports the finding that plaintiff's allegations of disability were not entirely credible. The ALJ determined that plaintiff's complaints were only partially credible due to a lack of medical evidence supporting his complaints, his continued smoking, his daily activities, and his improvement with medications. (Tr. 16-20.) During the hearing, plaintiff testified to a number of facts which diminished his credibility. Plaintiff testified that he had been incarcerated several times, the last time being in 2009 for possession of cocaine. (Tr. 31.) He has used PCP, marijuana, and cocaine and admitted to smoking marijuana a couple of months prior to the hearing date. He inhaled cocaine six months prior to the hearing date. (Tr. 38.) The ALJ questioned plaintiff as to why he continued smoking substances which aggravate COPD conditions. (Id.) Plaintiff responded he has not used the substances since his condition got worse. (Tr. 39.) However, plaintiff was well aware that COPD symptoms are exacerbated by smoking when he first visited St. Mary's Health Center Emergency Department. (Tr. 172.) The medical report attached a discharge reference on COPD which clearly warns to stop smoking and avoid exposure to smoke because it will aggravate breathing. (Tr. 190.) Yet plaintiff continued to smoke marijuana. On his follow-up visit on November 19, 2013, he admitted to occasional marijuana use. (Tr. 287.) Plaintiff was also noted as having a history of cocaine use. (Tr. 272.)

Plaintiff's daily activities also discredit his complaints of disabling pain. He testified that he is able to get out of bed in the morning, bathe and dress, use the toilet, prepare his meals, walk in the neighborhood, and do his laundry. (Tr. 41, 42.) He takes out the trash and does yardwork such as picking up leaves or transferring bushes. (Tr. 43.) He can walk three or four blocks without getting tired and lift thirty pounds. (Tr. 40, 41.) Moreover, plaintiff helps his sister take care of a patient who lives with them by cooking and doing his laundry. (Tr. 30.) Plaintiff also babysits his nephew. (Tr. 34.)

Plaintiff's medical reports show that with consistent treatment his complaints of SOB and COPD subside. On both visits to the emergency room plaintiff was discharged the same day after significant improvement with medical treatment. (Tr. 176, 195.) In addition, several x-ray examinations showed clear lungs and normal heart size. (Tr. 179, 201, 259, 306, 312.) The medical assessment conducted on November 20, 2013, showed that plaintiff was at Stage II COPD. (Tr. 273.) Nonetheless, it was noted that he did not have difficulty walking, getting dressed, bathing and grooming, memory problems, eating/feeding problems, speaking problems, or performing daily activities including cooking, cleaning, shopping, and driving. (Tr. 274.) Moreover, plaintiff admitted during the hearing that when he uses his inhalers and does not smoke, his breathing is controlled. (Tr. 40.) Plaintiff also testified to dizziness and SOB. However, the ALJ noted that plaintiff could breathe normally after using his inhaler and he denied experiencing dizziness to his doctors. (Tr. 33, 46, 192, 195, 320-322.) Plaintiff's cardiac and pulmonary examinations were determined to be normal on his visit to the Pulmonary Clinic on February 21, 2014. (Tr. 320, 322.) He also denied respiratory distress and SOB. (Tr. 320.) Therefore, substantial evidence supports the finding that plaintiff's impairments were not disabling, because he failed to stop smoking knowing it worsens his COPD symptoms, he was able to perform a significant amount of daily activities to lead a normal life, and medical reports showed that treatment of SOB and COPD were able to control his complaints.

### B. Plaintiff's RFC

Plaintiff also argues that the ALJ's determination that plaintiff had the RFC to perform medium work was erroneous because an individual with moderate COPD cannot sustain medium work on a regular and continuing basis. (Doc. 18 at 4.)

The RFC is what a plaintiff can do despite his limitations, which is to be "determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a)(1); see 20 C.F.R. § 416.929 ("In

determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"). It is plaintiff's burden to prove his RFC, and the ALJ is responsible for determining RFC based on all relevant evidence in the record. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). Prior to determining plaintiff's RFC, the ALJ must first evaluate the plaintiff's credibility. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

Plaintiff argues that the outcome of his application depended upon whether he was found to have the RFC for only light work or the RFC to perform medium work. (Doc. 18 at 4.) Compare Pt. 404 Subpt. P, App. 2, Table 2, Rule 202.04 (whereby he would be ruled disabled), with Rule 203.14 (not disabled). The regulations define light medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR § 416.967(c). Light work is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Id. at § 416.967(b).

After determining plaintiff's credibility, the ALJ considered the medical opinion in the record. (Tr. 20.) Dr. Lutey, one of plaintiff's treating physicians, recommended that plaintiff not drive, operate machinery, or perform other activities that could endanger himself or others while sleepy. (Tr. 315.) The ALJ gave this opinion limited weight, because the overall review of the record did not support these limitations. (Tr. 20.) Plaintiff also denied sleepiness in later examinations. (Tr. 291, 294.) Contrary to plaintiff's assertion that the ALJ failed to consider his SOB upon exertion which would cause him to take unscheduled breaks, the record does not support a finding that plaintiff would need to take unscheduled breaks. Neither Dr. Lutey, nor plaintiff's other treating physicians, limited plaintiff in this matter. Furthermore, plaintiff admitted that his SOB was controlled by the use of his inhalers. (Tr. 40.)

Plaintiff maintains that the ALJ failed to ask the VE a hypothetical question involving an individual who is required to take unscheduled or additional breaks. However, as discussed there was no evidence in the record showing that plaintiff needed

additional or unscheduled breaks.  Based on the VE's testimony, plaintiff could work as a laundry worker, patient transporter, and day worker.  These jobs exist in significant numbers in the national economy.  (Tr. 20, 50-51.)  The ALJ lawfully determined plaintiff's RFC based on the evidence contained in the record as a whole.

Substantial evidence supports the finding that plaintiff is not disabled.

## VII. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgement Order is issued herewith.

_____S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 11, 2016.